UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:

**RONALD J. COLLINS,** individually
and on behalf of those similarly situated*,*

      **Plaintiff,**

**vs.**                               **DEMAND FOR JURY TRIAL**

**SELECT PORTFOLIO SERVICING, INC,**

      **Defendant.**
_____/

## CLASS ACTION COMPLAINT

Plaintiff, RONALD J. COLLINS ("Collins"), by and through his counsel, Scott Hirsch Law Group, PLLC, and The Advocacy Group ("Counsel"), bring this class action lawsuit for violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.* (the "FDCPA"), the Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2601, *et seq.* ("RESPA"), Regulation X as adopted pursuant to RESPA, and the Truth in Lending Act of 1968, as amended ("TILA"), 15 U.S.C. § 1601 *et seq.*, Regulation Z, adopted pursuant to TILA, in accordance with the allegations set forth in the numbered paragraphs that follow.

## NATURE OF THE ACTION

1.    This is a putative class action brought under rule 23 of the Federal Rules of Civil Procedure by Plaintiff Collins, on his own behalf and on behalf of all others similarly situated, against a major loan servicer, SELECT PORTFOLIO SERVICING, INC ("Defendant" or "SPS").  SPS is employed by lenders to "service" mortgages on

their behalf.  Plaintiff and the Class Members are homeowners whose loans are in default and/or their homes have been in foreclosure. SPS is servicer of the mortgage loans which encumber Plaintiff's and Class Members' homes. As a servicer, SPS regularly acts as a debt collector.  This action is commenced to address SPS's pattern and practice of failing to comply with the response requirements of RESPA and to provide homeowners with an accurate statement regarding the mortgages that it services.

## PARTIES JURISDICTION AND VENUE

7.      Plaintiff, Robert J. Collins is an individual citizen of the State of Florida, residing in Palm Beach County.  At all times material, he owns and has occupied the property at issue, located at 35 Saint George Place, West Palm Beach, FL 33023 (the "Subject Property").

8.      Defendant, SPS is a Utah corporation with its principal place of business in Salt Lake City, Utah.  At all times material, Defendant SPS is and was a loan servicer as that term is defined in 12 U.S.C. § 2605(i)(2) and 12 C.F.R. § 1024.2(b).  Moreover, SPS services the loan obligation that's secured by a mortgage upon the Subject Property.

9.      SPS is also a "servicer" as defined by TILA and Regulation Z. *See* 15 U.S.C. § 1602(g); 12 C.F.R. 1026.36(c).

10.      The subject loan is a "federally related mortgage loan" as defined in 12 U.S.C. § 2602(1) and 12 C.F.R. § 1024.2(b) and referred to by Defendant SPS as account number ******6694.  A copy of the applicable note and mortgage loan documents encumbering the Subject Property are attached as Exhibit A.

11.     The Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises out of the FDCPA, RESPA and TILA, federal statutes.

12.     This Court has general diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and there is complete diversity between the Plaintiff and Defendant.  This Court also has jurisdiction over this matter pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §§1332(d). CAFA's requirements are satisfied in that (1) the members of the Class exceed 100; (2) the citizenship of at least one proposed Class member is different from that of the Defendant; and (3) the matter in controversy, after aggregating the claims of the proposed Class members, exceeds $5,000,000.00, exclusive of interest and costs.

13.     Venue is proper in the United States District Court in and for the Southern District of Florida pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to the Plaintiff's claims occurred in this district.

## LEGAL FRAMEWORK APPLICABLE TO THE CLAIMS

## RESPA AND REGULATION X STATUTORY STRUCTURE

14.     RESPA was enacted by Congress, in part, to ensure "that consumers throughout the nation are provided with greater and timelier information on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges caused by abusive practices that have developed in some areas of the country." 12 U.S.C. § 2601(a). Since "Congress intended RESPA to serve consumer-protection purposes[,] RESPA's provisions relating to loan servicing procedures should be

'construed liberally' to serve the statute's remedial purpose." *See Medrano v. Flagstar Bank, FSB*, 704 F.3d 661, 665-666 (9th Cir. 2012) (citations omitted).

15.     As part of its consumer protection functions, RESPA permits a borrower, or an agent of a borrower, to submit a "qualified written request" ("QWR") to the servicer of the borrower's "federally related mortgage loan." 12 U.S.C. § 2605(e)(1)(B). In sending a QWR to a servicer, a borrower can either request information from the servicer, or assert that the borrower's account is in error. 12 U.S.C. § 2605(e)(1)(B)(ii).

16.     RESPA provides that upon receipt of a QWR "a servicer of a federally related mortgage loan…shall provide a written response acknowledging receipt of the correspondence within 5 days (excluding legal public holidays, Saturdays, and Sundays) unless the action requested is taken within such period." 12 U.S.C. § 2605(e)(1)(A).

17.     Where a QWR requests a servicer to correct an error related to the servicing of a loan, RESPA provides that "not later than 30 days (excluding legal public holidays, Saturdays, and Sundays) after the receipt from any borrower of any qualified written request…the servicer shall…make appropriate corrections in the account of the borrower, including the crediting of any late charges or penalties, and transmit to the borrower a written notification of such correction" or, after conducting an investigation, "provide the borrower with a written explanation or clarification that includes…a statement of the reasons for which the servicer believes the account of the borrower is correct" either of which such notice "shall include the name and telephone number of a representative of the servicer who can provide assistance to the borrower." 12 U.S.C. §§ 2605(e)(2)(A)-(B).

18.     Where a QWR requests information regarding a loan, RESPA provides that "not later than 30 days (excluding legal public holidays, Saturdays, and Sundays) after the receipt from any borrower of any qualified written request…the servicer shall…provide the borrower with a written explanation or clarification that includes" the "information requested by the borrower or an explanation of why the information requested is unavailable or cannot be obtained by the servicer; and the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower." 12 U.S.C. § 2605(e)(2)(C).

19.     In 2010 RESPA was amended by Congress through the Dodd-Frank Wall Street Reform and Consumer Protection Act—Public Law No. 111-203, 124 Stat. 1376 (2010) to further clarify its application and to expand further obligations on servicers.

20.     As amended, it is a violation of RESPA for a servicer to "fail to take timely action to respond to a borrower's requests to correct errors relating to allocation of payments, final balances for purposes of paying off the loan, or avoiding foreclosure, or other standard servicer's duties." 12 U.S.C. § 2605(k)(1)(C).

21.     Moreover, RESPA, as amended, also requires servicers to respond to inquiries from borrowers seeking the identity and contact information of the owner or assignee of borrowers' mortgage loans within ten (10) business days. 12 U.S.C. § 2605(k)(1)(D).

22.     In addition to these amendments of RESPA, in January 2013, pursuant to the authority granted by the Dodd-Frank Wall Street Reform and Consumer Protection

Act—Public Law No. 111-203, 124 Stat. 1376 (2010)—the Consumer Finance Protection Bureau ("CFPB") issued a number of final rules concerning mortgage markets in the United States—known as "Regulation X" and codified as 12 C.F.R. § 1024.1, *et seq.* Regulation X became effective on January 10, 2014.

23.     Regulation X further expanded servicers' obligations under RESPA as it is unlawful, pursuant to RESPA, for a servicer to "fail to comply with any other obligation found by the Bureau of Consumer Financial Protection, by regulation, to be appropriate to carry out the consumer protection purposes of this chapter." 12 U.S.C. § 2605(k)(1)(E).

24.     Through its enaction of Regulation X, the CFPB has provided guidance for the interpretation of certain RESPA provisions, including servicers' duties when responding to borrowers' QWRs. Regulation X also imposes requirements upon servicers in responding to two (2) new categories of correspondence from borrowers related to their mortgage loans; specifically, Requests for Information ("RFIs") and Notices of Error ("NOEs"). "While there is significant overlap between QWRs and [NOEs] and [RFIs], the terms are not synonymous. The CFPB has made this clear in its official interpretation of the regulations: 'A qualified written request is just one form that a written notice of error or information request may take. Thus, the error resolution and information request requirements in §§ 1024.35 and 1024.36 apply as set forth in those sections irrespective of whether the servicer receives a qualified written request.' 12 C.F.R. § 1024, Supp. I." *See Messina v. Green Tree Servicing, LLC*, 210 F.Supp.3d 992, 1007 (N.D. Ill. 2016).

25.     Relative to RFIs, Regulation X provides that "a servicer shall comply with the requirements of this section for any written request for information from a borrower that includes the name of the borrower, information that enables the servicer to identify the borrower's mortgage loan account and states the information the borrower is requesting with respect to the borrower's mortgage loan." 12 C.F.R. § 1024.36(a).

26.     12 C.F.R. § 1024.36(d)(1) provides that a servicer must respond to an RFI by either "[p]roviding the borrower with the requested information and contact information, including a telephone number, for further assistance in writing" or "[c]onducting a reasonable search for the requested information and providing the borrower with a written notification that states that the servicer has determined that the requested information is not available to the servicer, provides the basis for the servicer's determination, and provides contact information, including a telephone number, for further assistance."

27.     Importantly, unlike QWRs, RFIs do not need to relate directly to "servicing" to trigger the duties under Regulation X. The CFPB specifically addressed the "servicing" issue in its commentary on 12 C.F.R. § 1024.36(f): "While the final rule does not require that servicers undertake the information request procedures in § 1024.36(c) and (d) for oral submissions, *it does not limit information requests to those related to servicing*." 78 F.R. 10696, 10761 (emphasis added). Therefore, a servicer is required to respond to "any written request for information," and the scope of 12 C.F.R. § 1024.36(a) is not limited to "requests relating to servicing." *See Pollack v. Seterus, Inc.*, Civil Action No. 17-60475-Civ, 2017 U.S. Dist. LEXIS 202827, at *8-9 (S.D. Fla.

Dec. 7, 2017); *St. Claire v. Ditech Fin. LLC*, No. 1:17-CV-03370-AT- JFK, 2018 U.S. Dist. LEXIS 219661, at *11 (N.D. Ga. Sept. 21, 2018).

28.    Relative to NOEs, Regulation X provides that "[a] servicer shall comply with the requirements of this section for any written notice from the borrower that asserts an error and that includes the name of the borrower, information that enables the servicer to identify the borrower's mortgage loan account, and the error the borrower believes has occurred…A qualified written request that asserts an error relating to the servicing of a mortgage loan is a notice of error for purposes of this section, and a servicer must comply with all requirements applicable to a notice of error with respect to such qualified written request." 12 C.F.R. § 1024.35(a).

29.    12 C.F.R. § 1024.35(e)(1) provides that a servicer must respond to an NOE by either "[c]orrecting the error or errors identified by the borrower and providing the borrower with a written notification of the correction, the effective date of the correction, and contact information, including a phone number, for further assistance" or "[c]onducting a reasonable investigation and providing the borrower with written notification that includes a statement that the servicer has determined that no error occurred, a statement of the reason or reasons for this determination, a statement of the borrower's right to request documents relied upon by the servicer in reaching its determination, information regarding how the borrower can request such documents, and contact information, including a phone number, for further assistance."

30.    Finally, RESPA and Regulation X impose requirements on servicers to respond to certain other inquiries from borrowers, even if those inquiries do not

constitute QWRs, RFIs, or NOEs.

31.     For example, 12 C.F.R. § 1024.35(b)(6) permits a borrower to submit an NOE regarding a servicer's "failure to provide an accurate payoff balance amount upon a borrower's request," even though a request for a payoff balance is governed by 12 C.F.R. § 1026.36(c)(3), and not the provisions of Regulation X relating to RFIs and NOEs.

## FDCPA STATUTORY STRUCTURE

32.     The purpose of the FDCPA is "to eliminate abusive debt collection practices . . . to promote consistent State action to protect consumers against debt collection abuses…" 15 U.S.C. § 1692.

33.     The Consumer Financial Protection Bureau ("CFPB")—the federal agency tasked with enforcing the FDCPA—once explained: "Harmful debt collection practices remain a significant concern today.

34.     According to CFPB, "[t]he Bureau receives more consumer complaints about debt collection practices than about any other issue." *See Hernandez v. Williams, Zinman, & Parham, P.C.*, No. 14-15672 (9th Cir. Aug. 20, 2014) (Brief of the CFPB as Amicus Curiae, ECF No. 14, p. 10)).

35.     Based upon data compiled by the CFPB, of all debt collection complaints, more than one-third relate to debt collectors' attempts to collect debts that consumers do not owe.[1]

---

[1] *See* Consumer Financial Protection Bureau, Fair Debt Collection Practices Act—CFPB Annual Report 2018 at 15 (2018), https://www.consumerfinance.gov/data-

36.     The FDCPA generally prohibits debt collectors, including SPS, from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt" [§ 1692e], and the use of "unfair or unconscionable means to collect or attempt to collect any debt." 15 U.S.C. § 1692f, including, but not limited to:

a.  False representations or misrepresentations of "the character, amount, or legal status of any debt." *Id.* at § 1692e(2)(A);

b.  False representations or misrepresentations of any "compensation which may be lawfully received by [the] debt collector for the collection of a debt." *Id*. at § 1692e(2)(B);

c.  "The collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law." *Id.* at § 1692f (1); and

d.  "The use of any false representation or deceptive means to collect or attempt to collect" a debt. *Id.* at § 1692e (10).

**TILA AND REGULATION Z STATUTORY STRUCTURE**

37.     The purpose of TILA is, among other things, "to protect the consumer against inaccurate and unfair credit billing . . . practices." 15 U.S.C. § 1601(a).

38.     As TILA is a consumer protection statute, it must be construed liberally

---

research/research-reports/fair-debt-collection-practices-act-annual-report-2018/.

and broadly in order to best serve Congressional intent.

39.     Those bound by TILA and its implementing regulations are obligated to discharge their obligations with absolute compliance.

40.     A "servicer," as defined by TILA, is:

> a person responsible for the servicing of a federally related mortgage loan (including the person who makes or holds such loan if such person also services the loan). Servicing means receiving any scheduled periodic payments from a borrower pursuant to the terms of any federally related mortgage loan, including amounts for escrow accounts under section 10 of RESPA [*Real Estate Settlement Procedures Act*] (12 U.S.C. 2609),
>
> *       *       *
>
> and making the payments to the owner of the loan or other third parties of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the mortgage servicing loan documents or servicing contract.

12  CFR § 1024.2(b)

41.     A consumer's need to be fairly apprised of his rights under a credit agreement is most acute when a lender maintains a security interest over his and his family's residence. It is against this backdrop that Congress empowered the Board of Governors of the Federal Reserve System (the "Board") to "prohibit acts or practices in connection with . . . mortgage loans that [it] finds to be unfair, deceptive, or designed to evade the provisions of this section[.]" 15 U.S.C. § 1639.

42.     In connection with this authority, and in its effort to curb "abusive servicing practices[,]" the Board in 2008 proposed regulations prohibiting loan servicers "from failing to provide, within a reasonable time after receiving a request from the consumer or any person acting on behalf of the consumer, an accurate statement of the full amount required to pay the obligation in full as of a specified date." 73 Fed. Reg.

1672, 1703 (Jan. 9, 2008).

43.     The Board expressed concern regarding

the misalignment of incentives between consumers, servicers, and investors. Servicers contract directly with investors, and consumers are not a party to the contract. The investor is principally concerned with maximizing returns on the mortgage loans. So long as returns are maximized, the investor may be indifferent to the fees the servicer charges the borrower. Consumers do not have the ability to shop for servicers and have no ability to change servicers (without refinancing). As a result, servicers do not compete in any direct sense for consumers. Thus, there may not be sufficient market pressure on servicers to ensure competitive practices.

[S]ervicers may not timely credit, or may misapply, payments, resulting in improper late fees     The Board is also concerned about the transparency of servicer fees and

charges, especially because consumers may have no notices of such charges prior to their assessment. Consumers may be faced with charges that are confusing, excessive, or cannot easily be linked to a particular service. ***In addition, servicers may fail to provide payoff statements in a timely fashion...***

*Id.* at 1702 (emphasis added)

44.     The inverse of the Board's reasoning is equally true: just as servicers have an incentive to disclose fees and charges in the least transparent method possible, they are equally disinclined to notify consumers of the availability of funds which may be credited in their favor.

45.     In 2010, Congress enacted the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), 12 U.S.C. § 5301 *et seq*., which established the CFPB. As part of the Act, it amended 15 U.S.C. § 1639 to empower the CFPB, in place of the Board, to "prohibit acts or practices in connection with . . . mortgage loans that the Bureau finds to be unfair, deceptive, or designed to evade the provisions of this section[.]" 15 U.S.C. § 1639(p)(2).

46.     The Board promulgated regulations concerning payoff statements, which

exist today in Regulation Z:

> In connection with a consumer credit transaction secured by a consumer's dwelling, a creditor, assignee or servicer, as applicable, must provide an accurate statement of the total outstanding balance that would be required to pay the consumer's obligation in full as of a specified date.

12 C.F.R. 1026.36(c)(3).

47.     Also as part of Dodd-Frank amendments to TILA, Congress enacted Section 129G, which, in substance, codifies the requirement to provide accurate payoff statements:

> A creditor or servicer of a home loan shall send an accurate payoff balance within a reasonable time, but in no case more than 7 business days, after the receipt of a written request for such balance from or on behalf of the borrower.

15 U.S.C. § 1639g.

48.     In its Official Interpretations, the CFPB states it "believes payoff statements should be issued according to the best information available at the time[.]" 78 Fed. Reg. 10902, 10958 (February 14, 2013).

49.     Violators of TILA are liable, among other things, for

- any resultant actual damages (15 U.S.C. § 1640(a)(1));

- statutory damages;
  - in individual actions not less than $400 or greater than $4,000 (15 U.S.C. § 1640(a)(2)(A)(iv)),
  - in class actions, the lesser of $1 million or 1 percent of the net worth of the creditor (15 U.S.C. § 1640(a)(2)(B); and

- costs and attorneys' fees (15 U.S.C. § 1640(a)(3).

## GENERAL FACTUAL ALLEGATIONS

50.     SPS is a mortgage loan servicer that regularly services mortgage loans in Florida, including loans owned or assigned by Fannie Mae/Freddie Mac.

51.     The Loan Servicer's duties and obligations are clearly filled in and defined by the Fannie Mae or Freddie Mac written Seller/Servicer Guidelines (the "Guidelines") when the loan is either serviced by the lender itself or sold to third-party servicer entities.

52.     In this instance, the loans at issue affecting Plaintiff and the Class Members are serviced by SPS; therefore, SPS is required to comply with all servicing guidelines.

53.     In its role as mortgage loan servicer, SPS was responsible for preparation of items concerning the Note and Mortgage including, but not limited to, preparing and sending monthly statements, accounting for credit and debits on the Note, calculating, collecting, and disbursing escrow amounts, sending notices, responding to QWRs, NOEs and RFIs pursuant to RESPA and Regulation X, overseeing the judicial foreclosure process including providing information for the same, and calculating payoff figures and transmitting payoff figures.

54.     Reinstatement Letters generated by SPS are uniform in composition and form.

55.     SPS is a mortgage "servicer" as that term is defined by 12 C.F.R. § 1024.2(b) and 12 U.S.C. § 2605(i)(2).  As stated above, SPS is the current servicer of the notes and mortgages on real property that secure those notes, owned by Plaintiff and the Members of the Class.

56.     At all times material hereto, Defendant SPS is an entity that was engaged (by use of the mail and telephone), in the business of attempting to collect a "debt" from Plaintiff, as defined by 15 U.S.C §1692a(5).

57.     Defendant, SPS, is a "debt collector" as defined in the FDCPA, § 1692a(6), in that it acquired the servicing of the loans after default and uses the U.S. Mail in a business for the principal purpose of which is the collection of any debts, or who regularly collects or attempt to collect, directly or indirectly, debts owed or due or asserted to be owed or due another.

58.     Plaintiff's obligation, or alleged obligation, owed or due, or asserted to be owed or due, arises from a transaction in which the money, property, insurance, or services that are the subject of the transaction were incurred primarily for personal, family, or household purposes—namely, a home equity line of credit (the "Debt").

59.     Plaintiff is a "consumer" as defined by 15 U.S.C. § 1692a(3).

60.     At the time SPS attempted to collect the alleged Debt from Plaintiff, the alleged Debt was in default, or Defendant treated the Debt as if it were in default.

61.     Defendant SPS became the servicer for the Debt on or about August 1, 2013 - after the Debt had already allegedly gone into default.

62.     Defendant SPS uses instrumentalities of interstate commerce or the mails in a business the principal purpose of which is the collection of any debts, and/or to regularly collect or attempt to collect, directly or indirectly, debts owed or due, or asserted to be owed or due, another.

63.     Defendant SPS represented to Plaintiff in its communication with Plaintiff that it was a debt collector and was subject to the FDCPA with regard to the Debt and its collection from Plaintiff.

64.     At all times material hereto, Plaintiff owned and continues to own the subject property, which is located in Palm Beach County, Florida.

## SPECIFIC FACTUAL ALLEGATIONS

65.     On November 10, 1994 Plaintiff Collins purchased the Subject Property. Thereafter, on May 15, 2007, Plaintiff encumbered the property, secured by a promissory note and mortgage in the amount of $775,000.00 in favor of JPMorgan Chase Bank, N.A., as lender.  *See* Exhibit A, previously attached.[2]

66.     Due to financial hardship, Plaintiff became delinquent and defaulted on his mortgage.

67.     On June 14, 2017 U.S. Bank N.A. as Trustee, on behalf of the holders of the J.P. Morgan Mortgage Trust 2007-S3 Mortgage Pass-Through Certificates, instituted foreclosure proceedings in the Circuit Court of the Seventeenth judicial Circuit in and for Palm Beach County, Case No: 50-2017-CA-006660-XXXX-MB.[3]

### SPS's Collection Practices are Misleading, Deceptive, and Violate the Law

68.     On or about August 31, 2021 Plaintiff, through his authorized agent, sent a written request to SPS for an accurate payoff statement pursuant to 12 C.F.R. §

---

[2] Upon execution of the Mortgage, the borrowers were Plaintiff Collins and his mother Viola Parker.  Mr. Collins never came off as borrower of the mortgage and note. SPS considers Plaintiff Collins as a confirmed successor-in-interest as that term is defined under RESPA and Reg X.  Regardless, SPS must respond to all written requests of a confirmed successor-in-interest as if they were the borrower.

[3] Through the instant action, Plaintiff is not challenging the outcome of the foreclosure action, nor is Plaintiff asking the Court herein to determine any property rights that form the basis of that action.

1026.36(c)(3) for the purposes of determining the amount necessary to payoff or reinstate the loan and save his home.

69.     On or about September 24, 2021, SPS responded to Plaintiff's request by sending Plaintiff a letter represented to be a reinstatement Letter (hereinafter, the "Reinstatement Letter"), and though not included, a payoff statement was said to be forthcoming.  However, Defendant SPS's September 24, 2021 Reinstatement Letter itself was inaccurate as it contained two line items of charges which are completely vague and identified only as "Payment to Accrue" and "Expenses Paid by Servicer (Loan Level Advances)." The composition and the amounts comprising the charges for "Payment to Accrue" and "Expenses Paid by Servicer (Loan Level Advances)" are not itemized or disclosed. There is no explanation provided concerning the ambiguously labeled "Payment to Accrue" and "Expenses Paid by Servicer (Loan Level Advances)." Indeed, there is no indication that the amounts of the charges contained within the "Payment to Accrue" and "Expenses Paid by Servicer (Loan Level Advances)" are estimates or were actually incurred or even owed by Plaintiff.   A copy of September 24, 2021 Reinstatement Letter is attached hereto as Exhibit B.

70.     SPS's Reinstatement Letter stated that: "The Total Reinstatement Amount expires at 5:00 pm Eastern Time on the Reinstatement Good to Date."   The Reinstatement Good to Date was identified as October 9, 2021.   Further, the Reinstatement Letter demands the "Total Reinstatement Amount " as being $859,412.97.

71.     The $859,412.97 amount also included other ambiguous amounts that could be estimates and may not have actually been incurred, including a "Payment to

Accrue" charge of $4,898.53 and a "Expenses Paid by Servicer (Loan Level Advances)" charge of $11,826.20.   SPS's September 24, 2021 Reinstatement Letter did not provide any information or explanation concerning the $4,898.53 charge ambiguously labeled "Payment to Accrue" or the $11,826.20 charge ambiguously labeled as "Expenses Paid by Servicer (Loan Level Advances)."

72.   SPS is fully aware and has actual knowledge that the standard mortgage loan agreements it services, including those of the Plaintiff, do not authorize the charging of fees which are estimates or not actually incurred such as those contained in the "Payment to Accrue" and "Expenses Paid by Servicer (Loan Level Advances)." Specifically, as servicer, SPS has direct access to and copies of the standard mortgage loan agreements for Plaintiff and the Members of Class.   SPS as a sophisticated and experienced servicer has actual knowledge of the types and amounts of fees it is allowed to charge pursuant to both the standard mortgage loan agreement and the servicing guidelines it is bound by.

73.   SPS knows that demands for payment containing the non-itemized amorphous charges of "Payment to Accrue" and "Expenses Paid by Servicer (Loan Level Advances)." are misleading as it does not give consumers, such as Plaintiff and Class Members, the ability to knowledgeably assess the validity of the claimed debt.

74.   SPS is a sophisticated mortgage loan servicer. In a highly publicized and remarkably similar matter, the Eleventh Circuit reversed the district court's grant of summary judgment on the FDCPA and FCCPA claims, opining, among other things, that the Defendants were not permitted to charge "estimated" fees that had not yet incurred in

their reinstatement of loan letter. See *Prescott v. Seterus, Inc*., No. 15- 10038, 2015 WL 7769235, at *2-6 (11th Cir. Dec. 3, 2015) ("[The Defendants] violated the FDCPA and FCCPA by charging [the Plaintiffs] estimated attorney's fees that they had not agreed to pay in the security agreement.").

75. Media and trade publications consistently warned the industry against including estimated fees in reinstatement or payoff letters, particularly those in the Eleventh Circuit where the *Prescott* case is binding precedent.

76. Therefore, SPS knew demanding payment of these fees was not permitted.

77. By the conduct described herein, SPS knowingly violated the FDCPA - which has, and is still causing Plaintiff actual injuries.

78. As SPS's September 24, 2021 Reinstatement Letter did not represent an "accurate" or sufficient statement as requested, Plaintiff, on or about January 6 2022, and pursuant to 12 U.S.C. § 2605(e) and 12 C.F.R. 1024.35(a), sent SPS a "notice of error" (the "1st NOE")[4]. In the 1st NOE, Plaintiff made a second request for an accurate payoff statement ("second payoff request"). SPS received Plaintiff's 1st NOE and 2nd payoff request on January 11, 2022 but failed to timely respond to, and/or timely investigated Plaintiff's 1st NOE. A copy of Plaintiff's January 6, 2022 1st NOE/2nd payoff request and USPS Delivery Confirmation; is attached hereto as Exhibit "C."

79. SPS violated RESPA, 12 U.S.C. § 2605(e)(2), 2605(k)(1)(C), and Regulation X, 12 C.F.R. § 1024.35(e)(3)(A), by failing to timely provide the Plaintiff with the information and documentation requested, or an explanation why the

---

[4] Plaintiff's 1st NOE was erroneously dated January 6, 2021.  This was a scrivener's error, and as the tracking number affixed to the NOE confirms was in fact sent in 2022.

information sought was unavailable, no later than seven (7) days after receipt of the Plaintiff's NOEs.

80.     Accordingly, Plaintiff sent a second NOE and 3rd payoff request on March 11, 2022 requesting that SPS correct the error. A copy of Plaintiff's 2nd NOE and 3rd payoff request is attached hereto as Exhibit "D."

81.     In Plaintiff's second NOE, Plaintiff also provided notice that SPS included improper estimated charges such as "Payment to Accrue" and "Expenses Paid by Servicer (Loan Level Advances).

82.     SPS has engaged in a pattern or practice of non-compliance with the requirements of the mortgage servicer provisions of RESPA as set forth in 12 U.S.C. § 2605.  SPS's violations RESPA and Regulation X affects not only Plaintiff but thousands of borrowers nationwide.

83.     Plaintiff was harmed by SPS's failure to timely respond to, and/or investigate Plaintiff's NOE.  This is evidenced by the fact that Plaintiff incurred costs relative to sending the NOE - such as his time, postage, traveling, photocopying costs; and reasonable attorney's fees.

## CLASS ACTION ALLEGATIONS

84.      Plaintiff brings this action individually and on behalf of all individuals similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of the Classes defined as follows:

Misleading or Non-Enumerated Fees Class:

All persons in the United States who had mortgage agreements for loans serviced by SPS, who were charged for fees that were not enumerated or explained on a payoff statement or reinstatement letter, within a category identified only as

"Payment to Accrue" and/or "Expenses Paid by Servicer (Loan Level Advances)."

RESPA and Regulation X Violations Class:

All persons in the United States who have or had mortgage agreements for loans serviced by SPS, who either (1) submitted to SPS a notice or request, in the form of a QWR, RFI, NOE, and/or other covered inquiry, and (2) to whom SPS failed to timely provide a complete response relative to the information requested and/or perform an investigation into the errors asserted therein based upon an exception not authorized by RESPA or Regulation X.

85.     Plaintiff reserves the right to modify or amend the proposed class definitions before the Court determines whether certification is appropriate.

86.     Excluded from the Class are persons whose payoff statements or reinstatement letters according to SPS records were returned as undeliverable, persons whose mortgages were for commercial purposes, not for personal, family, or household purposes, and Defendant, and any subsidiary or affiliate of Defendant, and the directors, officers and employees of Defendant or its subsidiaries or affiliates, and members of the federal judiciary.

87.     Under Fed. R. Civ. P. 23(a)(1), the proposed class is made up of at least 40 persons, the joinder of whom are impracticable except by means of a class action. The disposition of the claims in a class action will benefit both the parties and the Court. The exact number of class members can be determined through discovery and review of SPS's business records.

88.     The proposed class is ascertainable because it is defined by reference to objective criteria. In addition, and upon information and belief, the names and addresses

of all members of the proposed class can be identified in business records maintained by SPS.

89.      In conformance with Fed. R. Civ. P. 23(a)(2), all Class Members' claims (including Plaintiff's) are unified in that they arise from the same improper charging and collection practices arising out of materially identical circumstances. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the proposed class.

90.      Consistent with Fed. R. Civ. P. 23(a)(3), Plaintiff is a member of the Class. His claims are typical of all other Class Members.  All Class Members' claims are unified, as all were victims of the same collection and charging practices.

91.      Consistent with Fed. R. Civ. P. 23(a)(4), Plaintiff will adequately represent the class because he has interests in common with the proposed Class Members and he has retained attorneys who are experienced in class action litigation.

92.      Pursuant to Fed. R. Civ. P. 23(b)(3), there is a well-defined community of interest in the questions of law and fact involving and affecting the class to be represented by Plaintiff.  Common questions of law and/or fact predominate over any questions affecting only individual members of the class.  Common questions include, but are not limited to, the following:

a.   Whether SPS's impositions of  ""Payment to Accrue" and "Expenses Paid by Servicer (Loan Level Advances)" charges not being enumerated are deceptive, misleading and violate the FDCPA;

b.   Whether SPS's failed to timely provide substantive responses to Plaintiff's

and Class Members' inquiries in violation of RESPA and Regulation X;

c.  Whether Plaintiff and Class Members are entitled to statutory damages under the FDCPA and the amounts thereof;

d.  Whether Plaintiff and Class Members are entitled to recover statutory damages under RESPA and Regulation X and the amounts thereof;

e.  Whether SPS's failed to timely provide substantive responses to Plaintiff's and Class Members' inquiries in violation of TILA and Regulation Z;

f.  Whether Plaintiff and Class Members are entitled to recover statutory damages under TILA and Regulation Z and the amounts thereof;

g.  The proper measure of disgorgement and/or actual and/or punitive damages and/or restitution, as well as other recovery to the class, including fees and costs.

93.  Further, the prosecution of separate actions by individual members of the class would create a risk of:

a.  Inconsistent or varying adjudications concerning individual members of the class that would establish incompatible standards of conduct for the defendant opposing the class; and

b.  Adjudication with respect to individual members of the class that would, as a practical matter, be dispositive of the interests of other members not parties to such adjudications, and/or substantially impair or impede the ability of other non-party class members to protect such individual interests.

94.     The class action method is appropriate for the fair and efficient prosecution of this action.

95.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the amount of each Class Member's claims are small relative to the complexity of the litigation, and due to the financial resources of SPS, no member of the Class could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the members of the Class will continue to suffer losses and SPS's misconduct will proceed without remedy.

96.     Even if members of the Class could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

97.     A class action is also appropriate as Congress intended class actions to be a principal enforcement mechanism under TILA (*See* 15 U.S.C. § 1640(a)(2)(B)).

98.     Alternatively, certification is appropriate pursuant to Fed. R. Civ. P. 23(b)(2) because it is clear that declaratory and injunctive relief is appropriate respecting the Classes as a whole.

<u>**COUNT I**</u>

<u>**VIOLATIONS OF THE REAL ESTATE SETTLEMENT PROCEDURES ACT AND REGULATION X 12 U.S.C. § 2605(e)(2), 12 U.S.C. § 2605(k)(1), 12 C.F.R. § 1024.35(e)**</u>

99.     Plaintiff repeats and realleges paragraphs 1 through 83 as if fully stated herein.

100.    Plaintiff and the Members of the Class, in conjunction with their loans serviced by SPS, submitted notice of errors (NOEs) to SPS in which it received at the address that it has designated to receive such "qualified written requests" (QWRs).

101.    Plaintiff's and the Class Members' NOEs requested specific information related to their mortgage loans, and/or asserted that SPS committed specific errors related to the servicing of their loans, as contemplated by, *inter alia*, 12 U.S.C. § 2605(e)(1), 12 U.S.C. § 2605(k)(1), 12 C.F.R. § 1024.35(e)(6), and/or 12 C.F.R. § 1026.36(c).

102.    SPS failed to timely provide a substantive written response to Plaintiff's and the Class Members' NOEs and failed to correct any of the errors asserted in their Inquiries within the applicable timeframe of seven (7) business days of receipt—that is, within seven (7) business days of arrival at SPS's designated address—as required by 12 U.S.C. § 2605(k)(1)(C), 12 U.S.C. § 2605(e)(2), 12 C.F.R. § 1024.35(e), and 12 C.F.R. § 1026.36(c).

103.    SPS's failure to provide appropriate responses to NOEs regarding an accurate payoff statement within the applicable timeframes of seven (7) business days of receipt constitutes a clear violation of the requirements of 12 U.S.C. § 2605(k)(1)(C), 12 C.F.R. § 1024.36(c); 12 U.S.C. § 2605(e)(2), and 12 C.F.R. § 1024.35(e).  Indeed, 12

C.F.R. § 1024.35(g) and 12 C.F.R. § 1024.36(c), do not provide for any "exception" to SPS' duty to respond to Plaintiff's and Class Members' notice or errors.

104.   Plaintiff and the Class Members were harmed because they incurred expenses associated with sending the aforementioned Inquiries/NOEs - such as their time, postage cost, traveling cost, photocopying costs, and potentially reasonable attorney's fees etc. - but still did not, and have not, timely received the information or responses to which they are legally entitled, pursuant to RESPA and Regulation X.

105.   SPS's actions are in continuation of a pattern and practice of behavior in conscious disregard of the Plaintiff's and the Class Members' rights.

106.   As a result of SPS's actions and violations of RESPA and Regulation X, Plaintiff and the Class Members are entitled to actual damages, statutory damages, costs, and attorney fees pursuant to 12 U.S.C. §§ 2605(f)(1)-(3).

## COUNT II

## VIOLATION OF THE FAIR DEBT COLLECTION ACT 15 USC § 1692e

107.   Plaintiff repeats and realleges paragraphs 1 through 83 as if fully stated herein.

108.   Plaintiff and each Class Member was a "consumer" as defined by 15 U.S.C. § 1692a(3).

109.   The mortgage loans encumbering the property of Plaintiff and Class Members, which SPS service, are debts under the FDCPA because each is "an[] obligation or alleged obligation of a consumer to pay money arising out of a transaction .

. . [that is]…primarily for personal, family, or household purposes." 15 U.S.C. § 1692a(5).

110.    Additionally, the improper fees being charged and collected, in the form of the "Payment to Accrue" and "Expenses Paid by Servicer (Loan Level Advances)" are incidental to the principal obligation and subject to the Act. 15 U.S.C. § 1692f(1).

111.    SPS is a "debt collector" of those mortgage loans as defined by 15 U.S.C. § 1692a(6) because it regularly attempts to collect, and collects, amounts owed or asserted to be owed or due another, including the mortgage debts from Plaintiff and Class Members via Payoff Statements and Reinstatement Letters. The Reinstatement Letter described above indeed uniformly confirmed this by identifying SPS as a debt collector. And SPS acquired the servicing rights of Plaintiff and each Class Member's mortgage after they were in default.

112.    SPS engaged in direct "communications" with Plaintiff and Class Members as defined by 15 U.S.C. § 1692a(2) when it sent them or their representatives Payoff Statements or Reinstatement Letters, purportedly demanding money due for reinstatement or payoff of their mortgage loans.

113.    The FDCPA creates a private right of action under 15 U.S.C. § 1692k.

114.    Congress created shared, substantive statutory rights of Plaintiff and the Class Members to be privately enforced and protected under the FDCPA, which SPS has violated. *See* 15 U.S.C. §§ 1692, 1692e, 1692f.

115.    15 U.S.C. §1692e states, in relevant part, that:

> A debt collector may not use any false, deceptive, or
> misleading representation or means in connection with the

collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:

……

(2) The false representation of—
(A) the character, amount, or legal status of any debt; or
(B)      any services rendered or compensation which may be lawfully received by any debt collector for the collection of a debt.
………

(10) The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.

116.    Based on the foregoing allegations, SPS used deceptive means of collecting debts—which contained undisclosed fees for "Payment to Accrue" and "Expenses Paid by Servicer (Loan Level Advances)" with no itemization or description of what the charges may be for, representing in monthly loan statements and payoff statements or reinstatement letters, these fees for recurring gratuitous property inspections, ordered and scheduled by automated means, incorporating them —in violation of 15 U.S.C. § 1692e(10), because it represented them in Payoff Statements or Reinstatement Letters in a confusing, inaccurate manner, or in a manner that would likely mislead a consumer.

117.    Based on the foregoing allegations, SPS violated 15 U.S.C. § 1692e(2)(A) because through its Payoff Statements or Reinstatement Letters imposing "Payment to Accrue" and "Loan Level Advances," with no itemization or description of what the charges may be for, representing in monthly loan statements and reinstatement letters, payoff statements, these fees for recurring gratuitous property inspections, ordered and

scheduled by automated means, incorporating them, it falsely or in a misleading manner stated, or misrepresented, the amount, character, or status of the amounts needed to payoff Plaintiff's and Class Members' mortgage debts.

118.    Based on the foregoing allegations, SPS violated 15 U.S.C. § 1692e(2)(B) when through its Payoff Statements and Reinstatement Letters imposing "Payment to Accrue" and "Loan Level Advances" with no itemization or description of what the charges may be for, representing in monthly loan statements, reinstatement letters and payoff statements, these fees for recurring gratuitous property inspections, ordered and scheduled by automated means, it falsely or in a misleading manner stated, or misrepresented, the compensation that it might lawfully receive from Plaintiff and Class Members.

119.    These violations of FDCPA caused injury to Plaintiff and Class Members by violating the foregoing substantive FDCPA rights.

120.    As a result of these violations, Plaintiff and Class Members are entitled to statutory damages together with reasonable attorney's fees and costs under 15 U.S.C. § 1692(k).

### COUNT III

### VIOLATION OF THE FAIR DEBT COLLECTION ACT 15 USC § 1692f

121.    Plaintiff repeats and realleges paragraphs 1 through 83 as if fully stated herein.

122.    Plaintiff and each Class Member were a "consumer" as defined by 15 U.S.C. § 1692a(3).

123.     The mortgage loans encumbering the property of Plaintiff and Class Members, which SPS service, are debts under the FDCPA because each is "an[] obligation or alleged obligation of a consumer to pay money arising out of a transaction . . . [that is]…primarily for personal, family, or household purposes." 15 U.S.C. § 1692a(5).

124.     Additionally, the improper fees being charged and collected, in the form of the "Payment to Accrue" and "Expenses Paid by Servicer (Loan Level Advances)" are incidental to the principal obligation and subject to the Act. 15 U.S.C. § 1692f(1).

125.     SPS is a "debt collector" of those mortgage loans as defined by 15 U.S.C. § 1692a(6) because it regularly attempts to collect, and collects, amounts owed or asserted to be owed or due another, including the mortgage debts from Plaintiff and Class Members via Payoff Statements and Reinstatement Letters. The Reinstatement Letter described above indeed uniformly confirmed this by identifying SPS as a debt collector. And SPS acquired the servicing rights of Plaintiff and each Class Member's mortgage after they were in default.

126.     SPS engaged in direct "communications" with Plaintiff and Class Members as defined by 15 U.S.C. § 1692a(2) when it sent them or their representatives Payoff Statements or Reinstatement Letters, purportedly demanding money due for reinstatement or payoff of their mortgage loans.

127.     The FDCPA creates a private right of action under 15 U.S.C. § 1692k.

128.     15 U.S.C. § 1692f states, in relevant part:

> A debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:
>
> (1) The collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law

129.    Based on the foregoing allegations, SPS used unfair means of collecting amounts for "Payment to Accrue" and "Expenses Paid by Servicer (Loan Level Advances)" with no itemization or description of what the charges may be for, representing in monthly loan statements, reinstatement letters and payoff statements, these fees for recurring gratuitous property inspections, ordered and scheduled by automated means, incorporating them in violation of 15 U.S.C. § 1692f, because the amounts were not expressly authorized by Plaintiff's and Class Members' mortgage instruments creating their debts as they must be under those instruments, or they were not permitted by law.

130.    These violations of FDCPA caused injury to Plaintiff and Class Members by violating the foregoing substantive FDCPA rights.

131.    As a result of these violations, Plaintiff and Class Members are entitled to statutory damages together with reasonable attorneys' fees and costs under 15 U.S.C. § 1692(k).

## **JURY DEMAND**

132.    Plaintiff respectfully requests a trial by jury on all issues so triable.

## **PRAYER FOR RELIEF**

WHEREFORE Plaintiff, on behalf of himself and the Classes, respectfully requests this Court to award against SPS in favor of Plaintiff and the Classes all of the following:

    a. Certifying Plaintiff's claims for class treatment under Federal Rules of Civil Procedure 23(a) and (b)(3), appointing Plaintiff as Class Representative, and appointing Plaintiff's attorneys as counsel for the Classes;

    b. For an order awarding compensatory damages on behalf of Plaintiff and the Classes in an amount to be proven at trial;

    c. For judgment for Plaintiff and the Classes on their claims in an amount to be proven at trial, for compensatory damages caused by Defendant's unfair or deceptive practices, for exemplary damages to each Class member for each violation;

    d. For an order enjoining Defendant from continuing its unfair, unlawful, and/or deceptive practices, and any other injunctive relief as may appear necessary and appropriate;

    e. For judgment for Plaintiff and the Classes on their federal and state law claims, in an amount to be proven at trial;

    f. For pre-judgment and post-judgment interest as provided for by law or allowed in equity;

    g. For an order awarding Plaintiff and the Classes their attorneys' fees and costs; and,

      h.  Any other relief for Plaintiff and the Class the Court deems just and proper.

Dated: March 16, 2022.

By: *Scott D. Hirsch*
Scott David Hirsch
**SCOTT HIRSCH LAW GROUP**
Fla. Bar No. 50833
6810 N. State Road 7
Coconut Creek, FL 33073
Tel: (561) 569-7062
Email: scott@scotthirschlawgroup.com

**THE ADVOCACY GROUP**
Jessica L. Kerr
Fla. Bar. No. 92810
100 S. Biscayne Blvd, Suite 300
Miami, FL 33131
Telephone: (954) 282-1858
Facsimile: (954) 282-8277
Email: *jkerr@advocacypa.com*
*Attorneys for Plaintiff*